1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Kenny Renteria,                          )   CIV 12-994-PHX-MHB
                                             )
10                      Plaintiff,           )   **ORDER**
                                             )
11  vs.                                      )
                                             )
12  Carolyn W. Colvin, Commissioner of the   )
    Social Security Administration,          )
13                                           )
                        Defendant.           )
14  _____)

15          Pending before the Court is Plaintiff Kenny Renteria's appeal from the Social Security

16  Administration's final decision to deny his claim for disability insurance benefits and

17  supplemental security income.  After reviewing the administrative record and the arguments

18  of the parties, the Court now issues the following ruling.

19                          **I.  PROCEDURAL HISTORY**

20          On May 7, 2009, Plaintiff filed applications for disability insurance benefits and

21  supplemental security income pursuant to Titles II and XVI of the Social Security Act,

22  alleging disability beginning December 22, 2006.  (Transcript of Administrative Record

23  ("Tr.") at 135-44, 13.)  His applications were denied initially and on reconsideration.  (Tr.

24  at 67-74, 77-83.)  On May 28, 2010, he requested a hearing before an Administrative Law

25  Judge ("ALJ").  (Tr. at 84-85, 13.)  A hearing was held on October 19, 2011.  (Tr. at 31-62.)

26  On October 24, 2011, the ALJ issued a decision in which he found that Plaintiff was not

27  disabled.  (Tr. at 10-30.)  Thereafter, Plaintiff requested review of the ALJ's decision.  (Tr.

28  at 7-9.)

1    The Appeals Council denied Plaintiff's request, (Tr. at 1-6), thereby rendering the

2    ALJ's decision the final decision of the Commissioner.  Plaintiff then sought judicial review

3    of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

4                                    **II.  STANDARD OF REVIEW**

5            The Court must affirm the ALJ's findings if the findings are supported by substantial

6    evidence and are free from reversible legal error.  See Reddick v. Chater, 157 F.3d 715, 720

7    (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).  Substantial evidence

8    means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might

9    accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401

10   (1971); see Reddick, 157 F.3d at 720.

11           In determining whether substantial evidence supports a decision, the Court considers

12   the administrative record as a whole, weighing both the evidence that supports and the

13   evidence that detracts from the ALJ's conclusion.  See Reddick, 157 F.3d at 720.  "The ALJ

14   is responsible for determining credibility, resolving conflicts in medical testimony, and for

15   resolving ambiguities."   Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see

16   Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  "If the evidence can reasonably

17   support either affirming or reversing the [Commissioner's] conclusion, the court may not

18   substitute its judgment for that of the [Commissioner]."  Reddick, 157 F.3d at 720-21.

19                                    **III.  THE ALJ'S FINDINGS**

20           In order to be eligible for disability or social security benefits, a claimant must

21   demonstrate an "inability to engage in any substantial gainful activity by reason of any

22   medically determinable physical or mental impairment which can be expected to result in

23   death or which has lasted or can be expected to last for a continuous period of not less than

24   12 months."  42 U.S.C. § 423(d)(1)(A).  An ALJ determines a claimant's eligibility for

25   benefits by following a five-step sequential evaluation:

26           (1)  determine whether the applicant is engaged in "substantial gainful activity";

27           (2)   determine whether the applicant has a medically severe impairment or
             combination of impairments;

28

1

2

(3)  determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

3

4

(4)  if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

5

6

(5)  if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

7

8

9

10

See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. §§ 404.1520, 416.920).  At the fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can perform other substantial gainful work.  See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 22, 2006 – the alleged onset date. (Tr. at 15.)  At step two, he found that Plaintiff had the following severe impairments: arthritis; obesity; degenerative disc disease; tobacco abuse; narcotic abuse; abdominal pain; and torn meniscus with bilateral knee pain.  (Tr. at 15-18.)  At step three, the ALJ stated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Commissioner's regulations.  (Tr. at 18.)  After consideration of the entire record, the ALJ found that Plaintiff retained "the residual functional capacity to perform light work ... except for the following limitations: the claimant is capable of occasionally climbing ramps and stairs, balancing, stooping, crouching, crawling, and kneeling; but is precluded from climbing ladders, ropes, and/or scaffolds.  The claimant is to avoid concentrated use of moving machinery; and avoid concentrated exposure to unprotected heights.  He is capable of simple, unskilled work."[1] (Tr. at 18-23.)  The ALJ determined that Plaintiff was unable to perform any past relevant work, but based on his age, education, work experience, and residual functional capacity,

26

27

28

[1]  "Residual functional capacity" is defined as the most a claimant can do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks.

there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. at 23-25.) Therefore, the ALJ concluded that Plaintiff has not been under a disability from December 22, 2006, through the date of his decision. (Tr. at 25.)

## IV. DISCUSSION

In his brief, Plaintiff contends that the ALJ erred by: (1) failing to find him illiterate; (2) failing to properly consider his subjective complaints; and (3) failing to properly weigh medical source opinion evidence. Plaintiff requests that the Court remand for determination of benefits.

### A.   Plaintiff's Ability to Read and Write

Plaintiff argues that the ALJ erred by failing to find him illiterate. Specifically, Plaintiff contends that "[t]he ALJ ignor[ed] the evidence demonstrating illiteracy resulting in a mischaracterization of evidence and legal error." Plaintiff alleges that a finding of functional illiteracy is supported by his own testimony; the findings of consultative examiner Joanna Woods, Psy.D.; and the testimony of vocational expert Nathan Dean. Plaintiff states that a determination of disabled is mandatory pursuant to GRID Rule 202.09.[2]

In evaluating a claimant's education, the Social Security Administration uses the following categories:

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through

---

[2]   GRID Rule 202.09 provides for a disabled determination for individuals approaching advanced age (defined as 50-54 years of age), who are illiterate or unable to communicate in English, and who have "unskilled or none" previous work experience.

the 11th grade level of formal education is a limited education.

> (4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work. ...

20 C.F.R. §§ 404.1564(b)(1)-(4), 416.964(b)(1)-(4).  The Administration also emphasizes that the numerical grade level that the claimant completed in school may not represent his actual educational abilities – these may be higher or lower.  See 20 C.F.R. §§ 404.1564(b), 416.964(b)(1)-(4).  However, if there is no other evidence to contradict the numerical grade level, an ALJ will use it to determine a claimant's educational abilities.  See 20 C.F.R. §§ 404.1564(b), 416.964(b).

Plaintiff, who was 51-years-old at the time of the hearing, testified to the following regarding his education and ability to read and write:

Q      And what is the highest level of education you obtained?

A      I started ninth grade but never finished.

Q      Okay. So you completed eighth?

A      I completed eighth.

                    *        *        *

Q      How are you doing on learning to read and write?

A      It's not easy, but I work at it.

Q      Can you read three letter words?

A      Yes.

Q      Can you read and understand the newspaper?

A      I'd have to read it a few times, sound it out, but.

Q      Would you be able to write a phone message?

A      Short one.  Like, Rudy called me, I just say – spell it out the best I could and call him.

Q      Are you able to spell?

A      No.

Q      Do you know what grade level you read at?

A       Probably, I'd say fourth grade.

Q       If you were to take a phone message, say Mr. Slepian want you to return his call at 7:30 p.m., would you be able to do something like that?

A       Yeah, but like I say, I'd try to sound it out and then just write 7:30 call back.

(Tr. at 38, 41-42.)  Based on this testimony, Plaintiff's attorney examined the vocational

expert Nathan Dean stating, in pertinent part:

Q       Mr. Dean, from a vocational perspective given the claimant's limitations in ability to read and write, would that be equivalent to on a vocational scale to being illiterate?

A       Yes, I believe it would.

(Tr. at 59.)

On September 26, 2009, Joanna Woods, Psy.D., performed a consultative

examination.  (Tr. at 16, 522-28.)  As set forth in the ALJ's decision, Dr. Woods concluded

"there is no evidence to indicate that Mr. Renteria is unable to work based solely on Axis I

or Axis II diagnosis.  He does not currently meet criteria for major depression disorder nor

does he meet any criteria for posttraumatic stress disorder at this time.  He does not

demonstrate impairments in memory or concentration that would preclude him from work.

He is able to interact in a socially appropriate way.  He has demonstrated ability in the area

of adaptation as he has been participating in activities at a local gym."  (Tr. at 16, 526.)  Dr.

Woods further determined that Plaintiff "is able to remember and understand instructions,

locations and work like procedures."   He "has the ability to maintain attention and

concentration ..., carry out instructions and sustain a normal routine without special

supervision ..., interact with others ..., [and] respond appropriately to changes in a work

setting and to be aware of hazards and take appropriate action."  (Tr. at 16, 527.)  As to his

education, Dr. Woods noted that "Mr. Renteria states that he dropped out of high school

because he could not read or write.  He states he learned to read at the age of 34.  He took

one college course.  He was in special education for 'literacy.'"  (Tr. at 21, 523.)  Dr. Woods

also documented that during testing Plaintiff "was not able to spell the word WORLD

forward or backwards but was able to spell the word CAT forward and backwards." She indicated that "[t]his is likely based on his history of poor literacy." (Tr. at 525.) Lastly, she stated that "[w]hen asked to write a sentence that makes sense, his spelling was wrong, it was a run on sentence with poor grammar. He is suspected to have a below average IQ." (Tr. at 525.)

After considering the evidence set forth in the record regarding Plaintiff's ability to read and write, the ALJ found that Plaintiff has a limited education and is able to communicate in English. (Tr. at 24.) The ALJ stated, in pertinent part:

> [Plaintiff] claims he is illiterate, but there is no evidence to support this allegation. The claimant was able to obtain a driver's license; reports reading the newspaper, and took one college course. The claimant reports he learned to read at age 34. There is no prior allegations of illiteracy until the hearing. Moreover, the claimant has been able to perform skilled past work for most of his career. This is inconsistent with allegations of illiteracy. The medical evidence of record indicates the claimant is capable of paying bills, using the computer, handling his finances, and even reports he is in the process of writing a book (Exhibit 3E).

(Tr. at 21.)

The Commissioner, not this Court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence, and determine the case accordingly. Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in the evidence," moreover, "if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). At the same time, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" Batson, 359 F.3d at 1198 (citing Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir.1989)).

The Court finds that the ALJ did not err in finding that Plaintiff is able to read and write. Although Plaintiff testified that he could not read or write very well (Tr. at 41-42),

there is evidence in the record that conflicts with a finding that Plaintiff is "illiterate" under the regulations.  First, Plaintiff had an eighth-grade education (Tr. at 38, 157) and a history of skilled work (Tr. at 56), which are consistent with the regulatory definitions of "limited" or "marginal" education, rather than "illiteracy."  Compare 20 C.F.R. § 404.1564(b)(3) (Limited education "means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.") and 20 C.F.R. § 404.1564(b)(2) (Marginal education "means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education.") with 20 C.F.R. §§ 404.1564(b)(1) ("Generally, an illiterate person has had little or no formal schooling.").  The fact that Plaintiff testified that he could read and understand the newspaper and take a short phone message (Tr. 41), supports a conclusion that he could at least "read or write a simple message" under 20 C.F.R. § 404.1564(b)(1).

Second, as the ALJ indicated in his decision, except for the allegations set forth in the hearing testimony, the record is absent of, and Plaintiff fails to direct the Court to, any evidence demonstrating illiteracy.  Rather, the record – including Plaintiff's applications, disability reports, daily activities, as well as, the objective medical evidence – indicates that he can read and write in English.  And, although Dr. Woods (who Plaintiff relies upon in an effort to demonstrate illiteracy) notes a "history of poor literacy," she never states that Plaintiff is, in fact, illiterate.  Instead, she reports that Plaintiff learned to read at the age of 34 and took one college course.  (Tr. at 21, 523.)

Finally, as the Court has noted, Grid Rule 202.09 applies to an individual with unskilled, or no work experience.  Here, Plaintiff has a history of skilled work experience (Tr. 56), thus, Grid Rule 202.09 does not apply.

In sum, Plaintiff's assertion of illiteracy is unpersuasive.  The ALJ's finding that he was not illiterate is supported by substantial evidence of record.

1   **B.      Plaintiff's Subjective Complaints**

2       Plaintiff argues that the ALJ erred in rejecting his subjective complaints in the absence

3   of clear and convincing reasons for doing so.

4       To determine whether a claimant's testimony regarding subjective pain or symptoms

5   is credible, the ALJ must engage in a two-step analysis.  "First, the ALJ must determine

6   whether the claimant has presented objective medical evidence of an underlying impairment

7   'which could reasonably be expected to produce the pain or other symptoms alleged.'  The

8   claimant, however, 'need not show that her impairment could reasonably be expected to

9   cause the severity of the symptom she has alleged; she need only show that it could

10  reasonably have caused some degree of the symptom.'"  Lingenfelter v. Astrue, 504 F.3d

11  1028, 1036-37 (9th Cir. 2007) (citations omitted).  "Second, if the claimant meets this first

12  test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony

13  about the severity of her symptoms only by offering specific, clear and convincing reasons

14  for doing so.'"  Id. at 1037 (citations omitted).   General assertions that the claimant's

15  testimony is not credible are insufficient.  See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir.

16  2007).  The ALJ must identify "what testimony is not credible and what evidence undermines

17  the claimant's complaints."  Id. (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)).

18      In weighing a claimant's credibility, the ALJ may consider many factors, including,

19  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,

20  prior inconsistent statements concerning the symptoms, and other testimony by the claimant

21  that appears less than candid; (2) unexplained or inadequately explained failure to seek

22  treatment or to follow a prescribed course of treatment; and (3) the claimant's daily

23  activities."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see Orn v. Astrue, 495

24  F.3d 624, 637-39 (9th Cir. 2007).[3]  The ALJ also considers "the claimant's work record and

25  _____

26      [3]  With respect to the claimant's daily activities, the ALJ may reject a claimant's
    symptom testimony if the claimant is able to spend a substantial part of her day performing
27  household chores or other activities that are transferable to a work setting.  See Fair v.
    Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  The Social Security Act, however, does not
28  require that claimants be utterly incapacitated to be eligible for benefits, and many home

observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms ... ." Smolen, 80 F.3d at 1284 (citation omitted).

At the administrative hearing, Plaintiff testified that he lived by himself in an apartment, that he is 5' 8" tall and weighs 205 pounds, and that he attended school through the eighth grade. (Tr. at 38.) He stated that he has not worked since December of 2006, after being stabbed in the abdomen, small intestines, large intestines, and spine. (Tr. at 40, 42.) After the stabbing, Plaintiff underwent immediate surgery with complications of an infection that ran throughout his body and affected his kidneys and lungs. (Tr. at 42.) Two months following the stabbing and surgery, Plaintiff underwent additional surgery as there was incomplete removal of stool from the intestines. (Tr. at 42.) In total, Plaintiff underwent "four or five" surgeries and allegedly suffers ongoing abdominal pain with functional limitation. (Tr. at 43.) When lifting, moving the wrong way, or getting up from a seated position, Plaintiff experiences pain in the abdominal area that requires him to sit in a fetal position. (Tr. at 43.) He stated that he could lift 15 pounds at a time, but did not think he could do it on a regular basis. (Tr. at 44.) He stated that current treatment for his abdominal pain consisted of prescription medication, and also indicated that he was subject to back and knee pain that was treated with prescription medication and home exercises. (Tr. at 45.) Plaintiff stated that he could stand one-and-a-half to two hours at a time, and sit for two hours at a time. (Tr. at 46.) He also said that he has difficulty sleeping due to muscle cramps. (Tr. at 47.) Plaintiff indicated that he drinks a six-pack to a twelve-pack of beer a week. (Tr. at 48.) Plaintiff testified that during the day he does volunteer work at a youth program (boxing) he has developed, and that he does a lot of stretching, focus ball work, light weights, and Chi. (Tr. at 49-51.)

---

activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication. See id.

1    Having reviewed the record along with the ALJ's credibility analysis, the Court finds
2    that the ALJ made extensive credibility findings and identified several clear and convincing
3    reasons supported by the record for discounting Plaintiff's statements regarding his pain and
4    limitations.    Although the ALJ recognized that Plaintiff's medically determinable
5    impairments could reasonably be expected to cause the alleged symptoms, he also found that
6    Plaintiff's statements concerning the intensity, persistence, and limiting effects of the
7    symptoms were not fully credible.  (Tr. at 19-22.)

8    In his evaluation of Plaintiff's testimony, the ALJ first referenced the objective
9    medical evidence finding that said evidence did not support pain and limitations of the degree
10   alleged.  (Tr. at 19-21); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161
11   (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the
12   claimant's subjective testimony.") (citation omitted); Batson, 359 F.3d at 1197 (lack of
13   objective medical evidence supporting claimant's allegations supported ALJ's finding that
14   claimant was not credible).  Specifically, citing to medical records from John C. Lincoln
15   Hospital dated December 22, 2006 to February 21, 2009, the ALJ stated that the numerous
16   issues surrounding Plaintiff's stab wounds are "transient and resolved with immediate
17   treatment."  (Tr. at 19, 388-412.)  Further, citing to records from 21st Century Family
18   Medicine and Barrow Neurology Clinics, the ALJ stated that Plaintiff's treating physicians
19   were "heavily encouraged" that his MRIs and EMGs were "all within normal limits" in
20   March of 2008 and that Plaintiff reported that he "was getting much better." (Tr. at 20, 231-
21   34.)  The ALJ noted that in May and June of 2008, the medical records indicated that
22   Plaintiff was "feeling about 80% better" after complaining of urinary and bowel obstruction-
23   type symptoms and that Bentyl "helped significantly."  (Tr. at 19-20, 238-41.)  The ALJ
24   found that Plaintiff was ultimately discharged from John C. Lincoln Hospital in May of 2008
25   in "good condition" with "no limitations on his activity or diet."  (Tr. at 20, 277.)

26   The ALJ then analyzed Plaintiff's pain management regimen citing multiple sources
27   within the medical record to discount Plaintiff's subjective complaints, see, e.g., Johnson v.
28   Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (evidence of "conservative treatment" is

1   sufficient to discount a claimant's testimony regarding severity of an impairment), as

2   follows:

> The medical evidence of record indicates the claimant's pain management
> regimen is effective at minimizing his chronic abdominal pain. "Moderate"
> stability of the claimant's pain was reported throughout 2011 (Exhibits 19F;
> 22F). May 2011 treatment notes indicate the claimant's functional impairment
> was "moderate," in that he reported his pain "interferes with only some daily
> activities" (Exhibit 23F, p.5). April 2011 treatment notes indicate that
> claimant is "active and generally healthy," and feeling "well now on Voltaren,
> etc." (Exhibit 23F, p.8). March 2011 treatment notes indicate the claimant is
> "active and generally healthy," with "generally stable" weight, despite
> complaining of back pain (Exhibit 18F, p.1). Treatment notes from the same
> office visit indicated he had "weaned himself off his opiates" (Exhibit 18F,
> p.1). Treatment notes from September 2010 indicated "the claimant has not
> been in for awhile," due to him exclusively seeing his pain management team
> (Exhibit 18F, p.11). The claimant reported his medications were "providing
> benefit" in June 2009 and denied any side effects (Exhibit 5F, p.80).

11   (Tr. at 20.) From 2007 through 2009, the ALJ, citing medical records from The Pain Center

12   of Arizona, documented multiple instances wherein Plaintiff reported that his medication was

13   "effective," that Plaintiff was noted to be improving and "doing well," and that Plaintiff's

14   pain was again reported as "moderate" or "current" stability. (Tr. at 20, 413-93.) Plaintiff

15   was consistently discharged from The Pain Center "without the use of any support

16   equipment," and, according to the records, was "able to learn how to tolerate physical pain

17   he is in with a minimal amount of pain medications." (Tr. at 20, 413-93, 698-707, 695.)

18       Again, citing from the various medical sources and records listed previously, the ALJ

19   additionally found that Plaintiff's physical examinations were "largely 'normal,' 'within

20   normal limits,' and 'unremarkable.'" (Tr. at 20.) He stated that the findings "repeatedly

21   included 'good' muscle strength, bulk and tone; 'normal' gait; 'normal' range of motion,

22   flexion and extension; 'unremarkable' sensory results; and 'normal' deep tendon reflexes."

23   (Tr. at 20.) He discussed the diagnostic studies performed on Plaintiff from January of 2009

24   through August of 2011 noting that in "June 2009 lumbar MRI results demonstrated 'mild'

25   facet hypertrophy at the L4-L5 and L5-S1 levels, with 'otherwise unremarkable' findings";

26   in "September 2009 lumbosacral MRI imaging revealed 'negative' results" and "upper and

27   lower extremity nerve conduction study data demonstrated 'mild' bilateral radiculopathy at

28   the S-1 level, with all other results normal"; in "October 2010 lumbar MRI results

1  demonstrated 'mild' spondylosis with 'no focal herniated nucleus pulpous, canal stentosis
2  or foraminal compromise'"; and in "August 2011 lumbar MRI images demonstrated
3  'minimal' facet arthrosis at L4-L5 and L5-S1, with 'no canal or foraminal compromise.'" (Tr.
4  at 21, 499-500, 520-21, 266, 718-19.)

5        In addition to the objective medical evidence used to support his credibility analysis,
6  the ALJ also found that evidence of Plaintiff's daily activities, as well as, inconsistencies in
7  the record "somewhat diminished" Plaintiff's credibility.  (Tr. at 21-22.)  "[I]f the claimant
8  engages in numerous daily activities involving skills that could be transferred to the
9  workplace, an adjudicator may discredit the claimant's allegations upon making specific
10  findings relating to the claimant's daily activities." Bunnell v. Sullivan, 947 F.2d 341, 346
11  (9th Cir. 1991) (citing Fair, 885 F.2d at 603).  "An adjudicator may also use 'ordinary
12  techniques of credibility evaluation' to test a claimant's credibility."  Id. (internal citation
13  omitted).  "So long as the adjudicator makes specific findings that are supported by the
14  record, the adjudicator may discredit the claimant's allegations based on inconsistencies in
15  the testimony or on relevant character evidence."  Id.

16        Regarding the inconsistencies in the record detracting from Plaintiff's credibility, the
17  ALJ addressed Dr. Woods' September 26, 2009 psychiatric consultation wherein Plaintiff
18  stated that he has been looking for work, but that no one will hire him with all the
19  medications he is taking.  (Tr. at 21, 524.)  As previously demonstrated, the ALJ found
20  multiple instances wherein Plaintiff reported that his medication was "effective," that he was
21  noted to be improving and "doing well," and that his pain was reported as "moderate" or
22  "current" stability.  (Tr. at 20, 413-93.)  Indeed, by June of 2009, Plaintiff was "able to learn
23  how to tolerate physical pain he is in with a minimal amount of pain medications."  (Tr. at
24  20, 695.)  Moreover, the ALJ found Plaintiff's allegation of illiteracy (previously addressed
25  by this Court at 4-9) inconsistent with the evidence set forth in the record.

26        As to Plaintiff's daily activities, the ALJ stated, "the claimant has described daily
27  activities which are not limited to the extent one would expect, given the complaints of
28  disabling symptoms and limitations."  (Tr. at 21.)  According the records provided from Dr.

1  Woods' consultation and The Pain Center of Arizona, the ALJ found that Plaintiff "teaches
2  and volunteers and works with children to keep himself active." (Tr. at 21, 522-28.) Plaintiff
3  alleges no limitations with his activities of daily living, and no problems with his personal
4  care.  Plaintiff reported going for daily walks, visiting his son and granddaughter daily,
5  teaching children how to box, spending "five hours per day" at the gym, being "able to do
6  his chores at his home," shopping for groceries, and doing laundry. (Tr. at 21, 522-28.) At
7  the hearing, Plaintiff testified that he is capable of standing for "two hours," and the record
8  indicates that Plaintiff socializes "daily," and states that he is "writing his own book." (Tr.
9  at 22, 46, 522-28.)  While not alone conclusive on the issue of disability, an ALJ can
10 reasonably consider a claimant's daily activities in evaluating the credibility of his subjective
11 complaints.  See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008)
12 (upholding ALJ's credibility determination based in part of the claimant's abilities to cook,
13 clean, do laundry, and help her husband with the finances); Burch v. Barnhart, 400 F.3d 676,
14 680-81 (9th Cir. 2005) (upholding ALJ's credibility determination based in part on the
15 claimant's abilities to cook, clean, shop, and handle finances).

16        In summary, the Court finds that the ALJ provided a sufficient basis to find Plaintiff's
17 allegations not entirely credible.  While perhaps the individual factors, viewed in isolation,
18 are not sufficient to uphold the ALJ's decision to discredit Plaintiff's allegations, each factor
19 is relevant to the ALJ's overall analysis, and it was the cumulative effect of all the factors
20 that led to the ALJ's decision.  The Court concludes that the ALJ has supported his decision
21 to discredit Plaintiff's allegations with specific, clear and convincing reasons and, therefore,
22 the Court finds no error.

23 **C.     Medical Source Opinion Evidence**

24        Plaintiff contends that the ALJ erred by failing to properly weigh medical source
25 opinion evidence.  Specifically, Plaintiff argues that the ALJ failed to consider the opinions
26 of John Prieve, D.O., who performed a consultative examination on September 1, 2009, and
27 Plaintiff's treating physician, Brock Merritt, D.O.

28

"The ALJ is responsible for resolving conflicts in the medical record." <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d at 1164.  Such conflicts may arise between a treating physician's medical opinion and other evidence in the claimant's record.  In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  <u>See</u> <u>Lester</u>, 81 F.3d at 830.  The Ninth Circuit has held that a treating physician's opinion is entitled to "substantial weight."  <u>Bray v. Comm'r, Soc. Sec. Admin.</u>, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988)).  A treating physician's opinion is given controlling weight when it is "well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2).  On the other hand, if a treating physician's opinion "is not well-supported" or "is inconsistent with other substantial evidence in the record," then it should not be given controlling weight.  <u>Orn</u>, 495 F.3d at 631.

If a treating physician's opinion is not contradicted by the opinion of another physician, then the ALJ may discount the treating physician's opinion only for "clear and convincing" reasons.  <u>See</u> <u>Carmickle</u>, 533 F.3d at 1164 (quoting <u>Lester</u>, 81 F.3d at 830).  If a treating physician's opinion is contradicted by another physician's opinion, then the ALJ may reject the treating physician's opinion if there are "specific and legitimate reasons that are supported by substantial evidence in the record."  <u>Id.</u> (quoting <u>Lester</u>, 81 F.3d at 830).

## 1.    Dr. Prieve

Plaintiff contends that the ALJ erred in rejecting Dr. Prieve's opinion "based on the allegation that Dr. Prieve was not properly licensed at the time of the examination and was not a qualified medical source."  Plaintiff alleges that Dr. Prieve was properly licensed at the time the examination was conducted, and asserts that "because the Defendant has not established specific and legitimate reasons set forth by the ALJ for rejecting the medical opinion of Dr. Prieve, said opinion should now be credited as true."

1    According to the record, Dr. Prieve performed a consultative examination on

2    September 1, 2009.  (Tr. at 511-19.)  The parties briefly discussed Dr. Prieve's evaluation

3    at the October 19, 2011 hearing before the ALJ stating:

4        [Plaintiff's] ATTY:  Yes, I'm going to back track on one of the things that I
                              had mentioned earlier, Your Honor.

5
         ALJ:  Okay.
6
         [Plaintiff's] ATTY:  We do note that there's an evaluation for Dr. Preeve
7                             (Phonetic).  It's my understanding that based upon –

8        ALJ:  No license?  Yeah, that's already factored in.

9    (Tr. at 35.)

10   In his decision, addressed Dr. Prieve's findings and opinion as follows:

11       John Prieve, D.O. performed a consultative examination of the claimant at the
         request of the State agency and submitted a medical source statement (Exhibit
12       7F).  However, Dr. Prieve was not properly licensed during the time he
         performed the examination and rendered his medical opinions.  Because he
13       was not licensed, he was not a "qualified" medical source to perform the
         consultative examination under 404.1519(g) and 416.919(g), was not a
14       qualified psychological consultant as defined in 20 CFR 404.1616(e) and
         416.1016(e), or an "acceptable medical source" under 20 CFR 404.1513(a)(1)
15       and (2), 416.913(a)(1) and (2).  Therefore, reliance on his findings, statements,
         or opinions as a qualified or acceptable medical source would be erroneous.
16
     (Tr. at 22-23.)
17
18   In support of his argument that Dr. Prieve was licensed to practice medicine in

19   Arizona at the time of the examination, Plaintiff directs the Court to the Official Website of

20   the Arizona Medical Board, www.azmd.gov.   Under the heading entitled "General

21   Information," Dr. Prieve is currently listed as having an "Active" license, with a license issue

22   date of January 15, 2003.  Under the heading entitled "Board Actions," however, Dr. Prieve

23   is listed as having been under probation pursuant to a Consent Agreement beginning

24   February 1, 2007 through August 8, 2011.  According to the information provided in the

25   Consent Agreement, Dr. Prieve's license to practice medicine was suspended by the

26   Massachusetts Board of Registration in Medicine as a result of disciplinary action taken in

27   the State of Massachusetts related to alcohol and chemical dependency issues.

28

1    Having reviewed the record as well as the submissions provided by Plaintiff, the Court
2  finds no error in the ALJ's decision not to rely on Dr. Prieve's findings.  Although it appears
3  that Dr. Prieve's Arizona license had not been revoked or suspended during the time frame
4  in question, he was, in fact, on probation for 5 years.  Further, the Massachusetts Board of
5  Registration in Medicine did suspend Plaintiff's license to practice medicine in the
6  Commonwealth indefinitely – which ultimately led to Plaintiff's probationary status in
7  Arizona.  Thus, according to 20 C.F.R. § 404.1503a, any reliance on Dr. Prieve's opinion
8  would have been error.   20 C.F.R. § 404.1503a provides that the Social Security
9  Administration will not use in its program "any individual or entity ... whose license to
10  provide health care services is currently revoked or suspended by any State licensing
11  authority ...."  Therefore, the Court will not disturb the ALJ's conclusion as to Dr. Prieve.[4]

12       **2.    Dr. Merritt**

13    Plaintiff argues that the ALJ erred in giving greater weight to a non-treating, non-
14  examining source over the opinion of Dr. Merritt who recommended on February 11, 2010,
15  that Plaintiff not work for one year.  Since the opinion of Dr. Merritt, Plaintiff's treating
16  physician, was contradicted by State agency medical consultants, as well as, other objective
17  medical evidence, the specific and legitimate standard applies.

18    Historically, the courts have recognized the following as specific, legitimate reasons
19  for disregarding a treating or examining physician's opinion: conflicting medical evidence;
20  the absence of regular medical treatment during the alleged period of disability; the lack of
21  medical support for doctors' reports based substantially on a claimant's subjective complaints
22  of pain; and medical opinions that are brief, conclusory, and inadequately supported by
23  medical evidence.  See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Flaten

24  _____

25       [4] Plaintiff also alleges that the ALJ erred in "concluding that Dr. Prieve was provided
26  fallacious information."  Under the discussion of Dr. Prieve's opinion, the ALJ states that in
    light of that fact that Dr. Prieve was not properly licensed "reliance on his findings,
27  statements, or opinions as a qualified or acceptable medical source would be erroneous."
    There is no mention of, or conclusion as to, "fallacious information" and, thus, Plaintiff's
28  argument is unpersuasive.

1  v. Secretary of Health and Human Servs., 44 F.3d 1453, 1463-64 (9th Cir. 1995); Fair, 885

2  F.2d at 604.  Here, the Court finds that the ALJ properly gave specific and legitimate reasons,

3  based on substantial evidence in the record, for discounting Dr. Merritt's opinion.

4        Subsequent to being stabbed in the abdomen, Plaintiff received treatment from Dr.

5  Merritt beginning as a new patient in March of 2008.  (Tr. at 248-249.)  Dr. Merritt's

6  treatment notes show that he treated Plaintiff for abdominal and low back pain post

7  abdominal surgery.  (Tr. at 235-36, 238-39, 241-42, 245-46, 248-49, 571, 575, 578-79, 581-

8  82, 587-88.)  In February of 2010, the record indicates that Plaintiff saw Dr. Merritt for

9  "stuffy nose, headaches, sinus pressure, and follow-up on disability" as his "chief

10  complaint."  (Tr. at 587-88.)  As to his "history of present illness," Dr. Merritt stated that

11  Plaintiff "has still been unable to work and having a lot of pain in his low back."  (Tr. at

12  587.)  Dr. Merritt recommended "no work for the next year."  (Tr. at 588.)

13        On October 6, 2009, state agency medical consultant, Charles Fina, M.D., reviewed

14  the medical record and completed a Physical Residual Functional Capacity Assessment.  (Tr.

15  at 529-36.)  Dr. Fina opined that Plaintiff could lift and/or carry 20 pounds occasionally and

16  10 pounds frequently; stand and/or walk about six hours in an 8-hour workday; sit about six

17  hours in an 8-hour workday; frequently climb ramps/stairs, balance, stoop, kneel, crouch and

18  crawl; and occasionally climb ladders/ropes/scaffolds.  He found that Plaintiff did not have

19  manipulative, visual, and communicative limitations but should avoid concentrated exposure

20  to hazards (machinery, heights, etc.).  Dr. Fina specifically noted that Plaintiff's "allegations

21  outweigh the facts," that "there are no positive neuro findings and the x-rays of the back are

22  NORMAL," and that "the neurosurgeon found nothing objectively wrong with the clmt ...."

23  (emphasis original).  (Tr. at 529-36.)

24        On March 31, 2010, state agency medical consultant, L.A. Woodard, D.O., reviewed

25  the medical record and provided a Case Analysis.  (Tr. at 564.)  Dr. Woodard stated that "a

26  review of voluminous med. records on file is w/out obj. evid. of a signif. back abnormality."

27  (Tr. at 564.)  Specifically, Dr. Woodard determined:

28

> MER does indicate clt in altercation Dec., 2006 and had stab wound to abd, but was visceral injuries – no allega. of int. med/visceral impairments. In spite of multiple doctors, chronic narcotic use, etc., only a few remote office visits w/ only subj. complaints of tenderness, etc. – imaging is w/ very minimal abn.; normal LS x-r's in file, several LS MRI's w/ very mild abn – no disc bulging, spondylosis, etc.; at least 2 normal EMG's, and as stated, numerous fully normal P.E.'s by several different TP's.

(Tr. at 564.)  Dr. Woodard concluded that Plaintiff's condition "is w/out evid. of severity (non-severe) and clt should be able to perform all reasonable activities/maneuvers associated w/ SGA."  (Tr. at 564.)

In his evaluation of the objective medical evidence, the ALJ first addressed Dr. Fina's medical assessment, noted above, and found that Dr. Fina's conclusions were consistent with the treatment record, objective findings, opinion evidence, and the medical evidence as a whole.  (Tr. at 22.)  The ALJ gave "great weight" to Dr. Fina's opinion.  (Tr. at 22.)

Then, the ALJ discussed Dr. Woodard's findings set forth in her Case Analysis.  (Tr. at 22.)  The ALJ concluded the "rationale expressed by this consultant and the conclusions reached [were] consistent with the treatment record, objective findings, opinion evidence and the medical evidence as a whole."  (Tr. at 22.)  The ALJ gave Dr. Woodard's opinion "great weight."  (Tr. at 22.)

After discussing and ultimately discounting Dr. Prieve's opinion, the ALJ spent the majority of his discussion of the objective medical evidence examining Dr. Merritt's opinion. (Tr. at 23.)  The ALJ found, as follows:

> Brock Merritt, D.O., one of the claimant's treating physicians at 21st Century Family Physicians, recommended "no work for the next year" in February 2010 (Exhibit 18F, p.18).  However, this assertion is not corroborated by the medical evidence of record and relies heavily on the claimant's subjective complaints.   Numerous conclusions reported in the 21st Century Family Physicians treatment notes are not supported by the objective evidence nor diagnostic imaging specifically ordered by his office.  August 2011 treatment notes indicate the claimant "has had a couple of torn discs that are known and degenerative disc disease" (Exhibit 23F, p.5).  However, this is a subjective complaint not corroborated by the record.  No objective evidence or diagnostic imaging demonstrates a "torn" disc at any level.  August 2011 lumbar MRI images demonstrated "minimal" facet arthrosis at L4-L5 and L5-S1, with "no canal or foraminal compromise" (Exhibit 23F, p.11).  October 2010 lumbar MRI results demonstrated "mild" spondylosis with "no focal herniated nucleus pulpous, canal stenosis or foraminal compromise" (Exhibit 23F, p.12).  Dr. Merritt's treatment notes indicate "paperwork for disability" was completed, with no evidence of a physical examination performed (Exhibit 23F, p.1).

Moreover, these treatment notes indicate the claimant has "lower extremity neuropathy as well" (Exhibit 23F). This too, is uncorroborated by the record. As detailed above, diagnostic studies specifically found no evidence of neuropathy (Exhibit 6F, p.9). Finally, these same notes indicate the claimant does not use tobacco; when the claimant reports smoking "an average of one pack a day since 1970" with no cessation (Exhibit 22F, p.6). These inconsistencies serve to undermine the credibility of this proffered opinion even further. Moreover, Dr. Merritt specifically recommended exercise as part of the claimant's treatment. The claimant reports going to the gym daily, teaching children how to box, spending regular time with his family and friends, drinking beer and socializing, attending movies, prepares meals, and goes to the park. These activities are not consistent with this opinion proffering the claimant's inability to sustain competitive employment. This opinion is this afforded no weight.

(Tr. at 23.)

The Court finds that the ALJ did not err in his assessment of Dr. Merritt's opinion. Not only did Dr. Merritt give a determination on the ultimate question of disability – which said determination is reserved solely to the Commissioner – but the ALJ found that his conclusions were based primarily on Plaintiff's subjective complaints, and were uncorroborated and inconsistent with the objective medical evidence of record. See 20 C.F.R. § 404.1527(d)(1)-(3) (treating source opinions on whether a plaintiff is disabled are reserved to the Commissioner and are not entitled to any special significance); McLeod v. Astrue, 640 F.3d 881, 884 (9th Cir. 2011) (A treating physician's opinion is "not binding on an ALJ with respect to the existence of an impairment or the ultimate issue of disability."); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as incredible."); 20 C.F.R. § 404.1527(c)(4) (stating that an ALJ must consider whether an opinion is consistent with the record as a whole); Batson, 359 F.3d at 1195 (stating that an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings). Accordingly, the ALJ provided several specific and legitimate reasons, based on substantial evidence in the record, for discounting Dr. Merritt's opinion.

## V. CONCLUSION

Substantial evidence supports the ALJ's decision to deny Plaintiff's claim for disability insurance benefits and supplemental security income in this case. The ALJ's finding that Plaintiff was not illiterate is supported by substantial evidence in the record; the ALJ properly discredited Plaintiff's credibility providing clear and convincing reasons supported by substantial evidence; and the ALJ properly discounted the opinion of Dr. Prieve and also provided specific and legitimate reasons, based on substantial evidence, for discounting the opinion of Dr. Merritt. Consequently, the ALJ's decision is affirmed.

Based upon the foregoing discussion,

**IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social Security be affirmed;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly. The judgment will serve as the mandate of this Court.

DATED this 16th day of August, 2013.

_Michelle H. Burns_
Michelle H. Burns
United States Magistrate Judge